**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| ANNE M. SCHMIDT and AMBER N. GUTHRIE, on behalf of themselves and all others similarly situated<br><br>Plaintiffs<br><br>vs.<br><br>NATIONAL MENTOR HOLDINGS, LLC d/b/a SEVITA HEALTH<br><br>Defendant. | **Civil Action No.: 0:26-cv-2614**<br><br>**CLASS ACTION COMPLAINT** |

Plaintiffs Anne M. Schmidt and Amber N. Guthrie, individually and on behalf of the Class defined below of similarly situated persons, alleges the following against National Mentor Holdings, LLC d/b/a Sevita Health ("Sevita" or "Defendant") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters:

## NATURE OF THE ACTION

1.      It is both unfair and unlawful for companies like Sevita to impose discriminatory and punitive health insurance surcharges on employees who use tobacco products. This lawsuit challenges Defendant's unlawful practice of charging a "tobacco surcharge" under the Sevita Welfare Benefits Plan (the "Plan") without complying with the regulatory requirements under the Employee Retirement Income Security Act of 1974 ("ERISA") and the implementing regulations. ERISA permits health-contingent wellness

programs only if participants are offered a clearly disclosed, reasonable alternative standard that allows *every* similarly situated individual to obtain "the same, full reward," including retroactive refunds for surcharges paid while completing that alternative. *See* 29 U.S.C. § 1182(b)(2)(B); 42 U.S.C. § 300gg-4(j)(3)(D). A single defect, whether in design, timing, or disclosure, can disqualify a program from ERISA's statutory safe harbor, rendering the wellness program noncompliant and the surcharge discriminatory.

2.      Sevita's wellness program fails a basic disclosure requirement under ERISA: *none* of the participant-facing materials—not the Summary Plan Description ("SPD"), not the Annual Enrollment Guide, not the Tobacco Surcharge FAQ, and not any cessation program flyer—contain the statement that participants' personal physicians' recommendations will be accommodated in developing a reasonable alternative standard. While those materials describe the amount of the surcharge, the cessation program, and the reward, they omit the physician-accommodation statement. That statement is mandatory in "***all plan materials*** describing the terms" of a health-contingent wellness program and should be in the SPD. 42 U.S.C. § 300gg-4(j)(3)(E); 29 C.F.R. § 2590.702(f)(4)(v). Its absence from every Sevita document, despite extensive drafting attention given to the surcharge in those documents, is not an oversight in a single notice. It is a systemic, Plan-wide notice failure. A participant reading these materials in their entirety would have no way of knowing that ERISA entitles them to a personalized accommodation tied to their own physician's recommendation. ERISA's exception for wellness programs is narrow for a reason, and Sevita's failure to meet the necessary criteria disqualifies its surcharge from that protection, making it a straightforward violation of federal law.

3.    Tobacco surcharges have become more prevalent in recent years but to be lawful plans must make available a *compliant* "wellness program" that provides employees with avenues to avoid the surcharges. Making a compliant wellness program available means employers ***must*** adhere to strict rules set forth by ERISA and the implementing regulations established by the Departments of Labor, Health and Human Services, and the Treasury (collectively, the "Departments") over ten years ago in 2014. ERISA imbues the Departments with the authority to promulgate regulations interpreting ERISA § 702, 29 U.S.C. § 1182, the statute's non-discrimination provision. Accordingly, the Departments have developed a regulatory framework that "must be satisfied" to qualify for the statutory exception or safe harbor. Employers can only invoke this safe harbor if they can demonstrate full compliance with all the requirements. Moreover, while courts are no longer required to defer to an agency's interpretation of an ambiguous *statute* under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837 (1984), courts should still afford considerable weight to the Departments' interpretation under *Loper Bright v. Raimondo*, 604 U.S. 369, 394–95 (2024).

4.    ERISA's strict regulatory requirements are meant to ensure that wellness programs actually promote health and preclude discrimination, instead of wellness programs that are "subterfuge[s] for discriminating based on a health factor."[1] First and foremost, a wellness program must be genuinely designed to improve health or prevent disease, rather than functioning as an improper penalty imposed on certain participants

---

[1] *Incentives for Nondiscriminatory Wellness Programs in Group Health Plans*, 78 Fed. Reg. 33158, 33163 (June 3, 2013) (hereinafter the "**Final Regulations**").

under the guise of a health initiative. Defendant's Plan fails to provide the required disclosures that inform employees of their rights under the wellness program. Defendant imposes a $50 monthly surcharge on all tobacco users but does not inform participants in any Plan materials that a physician's recommendation will be accommodated and does not describe the tobacco surcharge or the wellness program in the SPD, making the surcharge discriminatory and unlawful.

5.     The need for regulatory safeguards surrounding these types of wellness programs is underscored by studies showing little evidence that wellness programs effectively reduce healthcare costs through health improvement. Instead, the savings employers claim often result in cost-shifting onto employees with higher health risks, disproportionately burdening low-income and vulnerable workers who end up subsidizing their healthier colleagues.[2] The regulatory safeguards seek to prevent wellness programs from being misused as thinly veiled revenue-generating schemes at the expense of employees who are least able to afford the additional costs by shifting the burden to plan sponsors to demonstrate compliance once a participant alleges discriminatory surcharges.

---

[2] Horwitz, J. R., Kelly, B. D., & DiNardo, J. E. (2013). *Wellness incentives in the workplace: Cost savings through cost shifting to unhealthy workers*. Health Affairs, 32(3), 468–476, 474 ("wellness programs may undermine laws meant to prevent discrimination on the basis of health status. Since racial minorities and people with low socioeconomic status are more likely than others to have more health risks, they are also more likely to be adversely affected by cost shifting"); *see also* Dorilas, E., Hill, S. C., & Pesko, M. F. (2022). *Tobacco surcharges associated with reduced ACA marketplace enrollment*. Health Affairs, 41(3), Abstract (finding that tobacco surcharges are significant barriers to affordable health insurance).

The goal is to ensure that wellness programs operate equitably and in a non-discriminatory manner, and to promote genuine health improvements.

6.      Outcome-based programs,[3] such as being tobacco-free or completing a smoking cessation program, must offer a clearly defined "*reasonable* alternative standard," which is an alternative way for "all similarly situated individuals" to obtain the reward (or avoid a penalty) if they are unable to meet the initial wellness program standard (i.e., being tobacco-free). Defendant violates these requirements by failing to notify participants in any Plan materials that a physician's recommendation will be accommodated, and by failing to disclose the tobacco surcharge or describe the wellness program in the SPD. Defendant's surcharge is discriminatory because the wellness program does not satisfy all the criteria that must be satisfied for a compliant program. *Id.* As a result, Sevita's program cannot qualify for ERISA's anti-discrimination safe harbor.

7.      Defendant cannot qualify for the statutory safe harbor for wellness programs because, while it imposes a health-based surcharge, Sevita fails to operate a compliant wellness program or provide proper notice to participants. The Plan fails to satisfy the essential regulatory criteria, which "***must*** be satisfied," (*Id*., 33160; emphasis added) for a wellness program to be lawful under ERISA. Final Regulations, 33160. This is not a flexible standard; it is a strict exception that allows employers to discriminate against participants by charging them hundreds of dollars annually. Therefore, even a minor design

---

[3] "An outcome-based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking or attaining certain results on biometric screenings) in order to obtain a reward." 29 C.F.R. § 2590.702(f)(1)(v).

or disclosure defect can remove the program from the narrow safe harbor and render the surcharge unlawful.

8.      The core deficiency of Defendant's wellness program is that it failed to provide proper notice in all Plan materials, in violation of 42 U.S.C. § 300gg-4(j)(3)(E) ("The plan or issuer involved shall disclose in *all* plan materials describing the terms of the wellness program the availability of a reasonable alternative standard." (emphasis added)). The participant-facing materials omit the required statement that participants' personal physicians' recommendations will be accommodated in establishing a reasonable alternative standard. *See* Final Regulations, 33166 ("a plan disclosure that references premium differential based on tobacco use . . . must include this disclosure"). These notice violations disqualify Defendant from asserting an affirmative defense in response to Plaintiff's allegations that its tobacco surcharge is discriminatory. Because Defendant cannot qualify for the statutory exception, the tobacco surcharge they impose on participants is unlawful and discriminatory in violation of ERISA.

9.      Sevita also fails the notice requirement because the SPD does not describe the tobacco surcharge or the terms of the wellness program. Federal law requires plans to disclose, "in all plan materials describing the terms of the wellness program," the availability of a reasonable alternative standard, contact information for accessing that standard, and that a participant's personal physician's recommendations will be accommodated. 42 U.S.C. § 300gg-4(j)(3)(E); *see* 29 C.F.R. § 2590.702(f)(4)(v). The Departments explicitly state that "[f]For ERISA plans, wellness program terms (including the availability of any reasonable alternative standard) are generally ***required to be***

***disclosed in the summary plan description*** (SPD) . . . if compliance with the wellness program affects premiums." 78 Fed. Reg. at 33166. The SPD describes the tobacco cessation program with only a bare cross-reference to a separate wrap document that, upon information and belief, was not provided to participants. The other participant-facing materials, while describing the cessation program and the availability of a refund, do not contain the required physician accommodation statement. These notice failures are themselves standalone violations that disqualify Defendant from invoking the regulatory safe harbor. Because Sevita cannot meet the mandatory criteria for lawful wellness programs, the surcharge it imposes is unlawful and discriminatory in violation of ERISA and its implementing regulations.

10.    This Complaint alleges that Defendant imposes a health-based tobacco surcharge without making available a compliant alternative standard to avoid the surcharge. Defendant bears the burden of proving that their tobacco surcharge is lawful by showing that their wellness program fully complies with ***every*** requirement under ERISA, including making available a reasonable alternative standard that allows ***all*** participants who satisfy the alternative standard to receive the full reward. This type of discrimination is permissible only if employers meet ERISA's strict wellness program criteria, which Defendant does not. No amount of *post hoc* justifications can cure this fundamental defect. Defendant's Plan is not a "program[] of health promotion or disease prevention" as required by ERISA but instead an impermissible cost-shifting scheme that unlawfully penalizes employees for their health status.

7

11. Further, Sevita engages in self-dealing with the proceeds of its unlawful tobacco surcharge, funds that become Plan assets the moment they are withheld from participants' paychecks. By applying those proceeds dollar-for-dollar against its own employer contribution obligation to the Plan, Sevita breached its fiduciary duties of loyalty and prudence under ERISA, 29 U.S.C. § 1104(a)(1)(A)–(B), and the statute's prohibited-transaction rules, 29 U.S.C. § 1106(b)(1). Each surcharge dollar extracted from a participant's wages reduces, by an identical dollar, the contribution Sevita must make to the Plan from its corporate funds. The harm is inflicted twice over because participants are charged surcharges they should never have paid, and the Plan itself is deprived of employer contributions. ERISA's fiduciary duties were enacted precisely to prevent this kind of conversion of plan assets into corporate savings and Sevita's use of the Plan to offset its contributions strikes at the heart of that prohibition, converting a wellness program supposedly aimed at participant health into a source of revenue for the company

12. Participants like Plaintiffs are, in the least, permitted to challenge the failure of an employer to include critical information about participants' rights in the materials that are shown to them during enrollment. Once a participant alleges that a surcharge violates ERISA's anti-discrimination provisions and alleges facts to support the deficiency in the wellness program, the burden shifts to the employer to demonstrate that its wellness program fully satisfies all the statutory and regulatory criteria, including the obligation to disclose a reasonable alternative standard and to notify participants of the same. *See Cunningham v. Cornell Univ.*, 145 S. Ct. 1020, 1029 (2025) (reaffirming "that 'the burden of persuasion as to certain elements of a plaintiff's claim may be shifted to

8

defendants, when such elements can fairly be characterized as affirmative defenses or *exemptions*.')".

13.     Plaintiffs are current and former employees and participants in the Plan who paid the unlawful surcharge to maintain health insurance coverage under the Plan. This surcharge imposed an additional financial burden on Plaintiffs and continues to impose such a burden on those similarly situated.

14.     Plaintiffs bring this lawsuit individually and on behalf of all similarly situated Plan participants and beneficiaries, seeking to recover these unlawfully charged fees and for plan-wide equitable relief to prevent Sevita from continuing to profit from its violations under 29 U.S.C. § 1109. Defendant, as Plan Administrator, is a fiduciary of the Plan who had, and continues to have, a legal obligation to act in the best interests of Plan participants and to comply with federal law. Plaintiffs, on behalf of themselves and the Plan as a whole, seeks appropriate equitable relief under 29 U.S.C. § 1132(a)(2) and (a)(3) to address Defendant's ongoing violations of ERISA's anti-discrimination provisions.

## PARTIES

15.     Plaintiff Anne M. Schmidt is, and at all times mentioned herein was, an individual citizen of the State of Illinois residing in Springfield. Ms. Schmidt is a former employee of Sevita who paid the tobacco surcharges associated with the health insurance offered through her employer during her employment.

16.     Plaintiff Amber N. Guthrie is, and at all times mentioned herein was, an individual citizen of the State of Indiana residing in Brazil. Ms. Guthrie is an employee of

Sevita who paid the tobacco surcharges associated with the health insurance offered through her employer during her employment.

17.     Plaintiffs are participants in the Plan pursuant to 29 U.S.C. § 1002(7).

18.     Defendant National Mentor Holdings, LLC d/b/a Sevita Health is a limited liability company with its principal place of business at 6600 France Avenue South, Suite 350, Edina, Minnesota 55435. Sevita is a nationwide provider of home and community-based healthcare and human services, including services for individuals with intellectual and developmental disabilities, behavioral health needs, brain injuries, and other complex care needs. Upon information and belief, Sevita operates throughout the United States through numerous affiliated entities and employs tens of thousands of employees nationwide.

19.     At all times relevant to this lawsuit, sponsored, maintained, and managed the Plan. Sevita employs thousands of individuals and as of December 2024, there were over 27,000 participants in the Plan. Defendant's employee benefit plan is subject to the provisions and statutory requirements of ERISA pursuant to 29 U.S.C. § 1002(3).

## **JURISDICTION AND VENUE**

20.     The Court has subject matter jurisdiction pursuant to 29 U.S.C. §1132(e)(1) and 28 U.S.C. § 1331, as this suit seeks relief under ERISA, a federal statute. It also has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have

different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

21. This Court has personal jurisdiction over Defendant because Defendant maintains its corporate headquarters and principal place of business in this District. Defendant conducts substantial business in Minnesota and has purposefully availed itself of the privilege of conducting activities in this State. Defendant has employees who reside and work in this District, and it implements aspects of the Plan.

22. Venue is proper in this District under 29 U.S.C. § 1132(e)(2) because this is a District where breaches of ERISA occurred, and where Defendant may be found. Sevita maintains its corporate headquarters in this District and employs numerous participants in the Plan within this District and applied the challenged surcharge to Plan participants residing in this District.

## FACTUAL BACKGROUND

## I. DEFENDANT'S SURCHARGES VIOLATE ERISA'S ANTI-DISCRIMINATION RULE.

### A. Statutory and Regulatory Requirements

23. Congress amended ERISA to prohibit any health insurer or medical plan from discriminating against participants in providing coverage or charging premiums based on a "health status-related factor," including tobacco use. ERISA § 702(b)(1), 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1). Under this rule, a plan "may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution that is greater than such premium or contribution for a

11

similarly situated individual enrolled in the plan based on any health-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual." *Id.*

24.  The statute permits group health plans to "establish[] premium discounts or rebates . . . in return for adherence to ***programs of health promotion and disease prevention***" (29 U.S.C. § 1182(b)(2)(B) (emphases added)); however, these "wellness programs"—to qualify for this statutory safe-harbor exception—must strictly adhere to the mandated regulatory requirements.

25.  Under ERISA § 505, 29 U.S.C. § 1135, Congress granted the Department of Labor the authority to issue regulations, including the power to establish regulations prohibiting discrimination against participants and beneficiaries based on their health status under ERISA § 702, 29 U.S.C. § 1182. This authority empowers the Secretary of Labor (the "Secretary") to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of" Title I of ERISA. (29 U.S.C. § 1135). Furthermore, ERISA § 734, 29 U.S.C. § 1191c, explicitly reinforces the Secretary's authority to issue regulations concerning group health plan requirements, which grants the power to "promulgate such regulations as may be necessary or appropriate to carry out the provisions" of ERISA Title I, Part 7. 29 U.S.C. § 1191c.

26.  Exercising this delegated authority, in 2006, the Secretary issued regulations through the notice-and-comment rulemaking process outlining the criteria that a wellness program must meet to qualify for the premium non-discrimination exception under ERISA § 702(b). *See* Final Regulations, 33158–59. Following the amendments by the

ACA and Public Health Service Acts, in 2010, the Departments published proposed regulations in November 2012 to "amend the 2006 regulations regarding nondiscriminatory wellness programs." *Id.*, 33159. These regulations (i.e., the Final Regulations) were approved and signed in 2013 to be effective January 1, 2014. *Id.*, 33158.

27.     The Final Regulations specify that health promotion or disease prevention programs, such as outcome-based wellness initiatives (i.e., smoking cessation programs), must meet detailed requirements to qualify for the statutory safe harbor. As the Departments explained, these criteria "***must be satisfied*** in order for the plan or issuer to qualify for an exception to the prohibition on discrimination based on health status." *Id.*, 33163. "That is," the Departments explained, "these rules set forth criteria for an ***affirmative defense*** that can be used by plans and issuers in response to a claim that the plan or issuer discriminated" against participants. *Id.* (emphasis added). That means once a participant alleges a discriminatory surcharge along with facts showing that the alternative standard offered to them is deficient, the burden then shifts to the employer to prove that the wellness program satisfies *all* the necessary criteria.

## B.  Regulatory Criteria

28.     To comply with ERISA and avoid unlawful discriminatory surcharges, outcome-based wellness programs must meet the following five (5) criteria:

(a) Frequency of opportunity to qualify: Participants must be given at least one chance annually to qualify for the reward associated with the program to ensure ongoing accessibility and fairness. 29 C.F.R. § 2590.702(f)(4)(i).

13

(b) Size of reward: penalties or rewards cannot exceed 50% of the cost of employee-only coverage. § 2590.702(f)(4)(ii)

(c) Reasonable design: programs must be "reasonably designed" to promote health and cannot be "a subterfuge for discriminating based on a health factor." This determination is based on all the relevant facts and circumstances. "To ensure that an outcome-based wellness program is reasonably designed to improve health and does not act as a subterfuge for underwriting or reducing benefits based on a health factor, a reasonable alternative standard to qualify for the reward must be provided to any individual who does not meet the initial standard based on a measurement, test, or screening. . . ." § 2590.702(f)(4)(iii)).

(d) Uniform availability and reasonable alternative standards: "The full reward under the outcome-based wellness program must be available to all similarly situated individuals." § 2590.702(f)(4)(iv).

(e) Notice of availability of reasonable alternative standard: notice must include (a) instructions on how to access the reasonable alternative standard; (b) contact information for inquiries about the alternative standard; and (c) *an explicit statement that participants' personal physician's recommendations will be accommodated*. *See* § 2590.702(f)(4)(v) (emphasis added).

29.     The criteria in the Final Regulations are not optional. They serve as the only lawful pathway for plans to impose health-based premium differentials by ensuring that wellness programs do not arbitrarily penalize participants and they prevent employers from using surcharges as a revenue-generating mechanism rather than a genuine tool for health

promotion. If a wellness program fails to meet even one of these stringent requirements, the program is noncompliant and the employer cannot benefit from the statutory carve-out. *See* § 2590.702(f)(4) (describing the "[r]equirements for outcome-based wellness programs," stating that a program "does not violate the provisions of this section *only if __all__ of the [] requirements are satisfied*.")

30.     For health contingent wellness programs, the Final Regulations require the notice be disclosed "in *all* plan materials describing the terms of" the program. 42 U.S.C. § 300gg-4(j)(3)(E); 45 C.F.R. § 146.121(f)(4)(v) (emphasis added). Further, the Final Regulations establish that "[f]or ERISA plans, wellness program terms (including the availability of any reasonable alternative standard) are generally required to be disclosed in the summary plan description (SPD), as well as in the applicable governing plan documents . . . if compliance with the wellness program affects premiums . . . under the terms of the plan." Final Regulations, 33166.

31.     As to the notice criterion specifically, both Congress and the Departments deliberately used the phrase "all plan materials" so that employers could not bury required notices in dense SPDs that participants rarely consult; the disclosure must appear in the actual materials participants use during enrollment. Plans that charge their participants more and fail to inform participants of their rights in *all* plan materials violate the notice rule

## II.     DEFENDANT CANNOT AVAIL ITSELF OF ERISA'S SAFE HARBOR

32.     Defendant's tobacco surcharge is discriminatory and unlawful because Defendant fails to make available a compliant wellness program. Sevita imposes a $50

monthly tobacco surcharge on participants who use tobacco and are enrolled in the Plan. While Defendant makes available a tobacco cessation program that, upon completion, allows participants to receive a refund of the surcharge and to have future surcharges eliminated, the Plan materials are deficient in two critical respects: (1) no Plan materials, including the SPD, the Benefit Enrollment Guides, or the Tobacco Surcharge FAQ documents, contain the required statement that a participant's personal physician's recommendations will be accommodated in developing a reasonable alternative standard, and (2) the SPD does not disclose the existence of the tobacco surcharge or describe the terms of the wellness program. These deficiencies independently and collectively disqualify Defendant's program from ERISA's statutory safe harbor.

33.     The Plan's SPDs contain, under a "Tobacco Cessation Program" heading, a single directive: "Refer to the Your Guide to [the] Plan wrap document." Ex. A., Plan SPD at 34. This bare cross-reference provides no information about the surcharge amount, no description of the cessation program, no explanation of how to access the program, no contact information for inquiries, and none of the disclosures required under 29 C.F.R. § 2590.702(f)(4)(v). Upon information and belief, the referenced "wrap document" was not provided to participants.

34.     Defendant provided separate Benefit Enrollment Guides to participants during annual and new-hire enrollment periods. *See* Ex. B., 2025 Enrollment Guide. A 2025 Enrollment Guide that states that "[i]f you use tobacco products, a monthly surcharge of $50 per month will be added to your contribution cost for medical coverage" and that participants can "get a refund of the tobacco surcharge if you complete the online tobacco

cessation workshop through AHealthyMe." Ex. B. at 12. Other benefit guides contain the same or substantially similar language. A 2026 Annual Enrollment Guide similarly describes the surcharge and the cessation course.

35. Defendant also has dedicated Tobacco Surcharge FAQ documents. These documents are participant-facing materials drafted specifically to address the surcharge. The 2025 Tobacco Surcharge FAQ, for example, is a three-page document containing nine questions and answers covering: (1) what the surcharge is; (2) how Sevita identifies tobacco users; (3) who counts as a "tobacco user"; (4) how to update tobacco status; (5) why the surcharge is imposed; (6) *how to get the surcharge waived*; (7) *what to do to complete the cessation program*; (8) whether quitting is required to receive a refund; and (9) where to direct further questions. *See generally* Ex. C., 2025 Tobacco User Surcharge FAQ. Despite drafting an entire FAQ document on the precise question of how to obtain the reward, Defendant did not include—in any of the nine answers—a statement that a participant's personal physician's recommendations will be accommodated, nor any reference to a physician-directed alternative standard. The 2024 and 2025 FAQ documents are materially identical in this respect. The FAQs direct participants exclusively to an online workshop, with answers like FAQ No. 6 stating that the surcharge can be waived *only* by "completing the Quit4Life program." Ex. C. at 3. Likewise, the cessation program flyers distributed to participants describe the program but contain no physician accommodation statement and no reference to any alternative pathway tied to a personal physician's recommendation.

17

36.     The omission is comprehensive. Across every plan year from at least 2024 through 2026, and across every category of participant-facing document—SPD, Annual Enrollment Guide, Tobacco Surcharge FAQ, and program flyers—*none* of the materials Defendant provided to participants contains the statement that a participant's personal physician's recommendations will be accommodated in developing a reasonable alternative standard. Under 29 C.F.R. § 2590.702(f)(4)(v) and 42 U.S.C. § 300gg-4(j)(3)(E), Defendant was required to include this statement in all Plan materials describing the terms of the wellness program. The Final Regulations further provide that "a plan disclosure that references a premium differential based on tobacco use . . . is a disclosure describing the terms of a health-contingent wellness program and, therefore, must include this disclosure." Final Regulations, 33166. Defendant's comprehensive omission deprived participants of any knowledge of their right to seek a personalized accommodation, a central regulatory safeguard ensuring that every individual can obtain the full reward of avoiding the surcharge regardless of their ability or appropriateness to complete the standard cessation program.

37.     In addition, the SPD itself—the primary disclosure document under ERISA—fails to disclose the tobacco surcharge or describe the terms of the wellness program. For ERISA plans, the Final Regulations establish that "wellness program terms (including the availability of any reasonable alternative standard) are generally required to be disclosed in the summary plan description (SPD), as well as in the applicable governing plan documents . . . if compliance with the wellness program affects premiums . . . under the terms of the plan." Final Regulations, 33166. Sevita's SPD contains no description of

the $50 monthly surcharge, no description of the cessation program, no contact information for accessing the program, and no physician accommodation statement, only a bare cross-reference to a wrap document that, upon information and belief, was not provided to participants. The absence of any substantive disclosure of the tobacco surcharge and wellness program in the SPD is a standalone violation that independently disqualifies Defendant from invoking the regulatory safe harbor.

38.     Taken together, Defendant's tobacco surcharge program is noncompliant because (i) no Plan materials contain the required statement that a participant's personal physician's recommendations will be accommodated, in violation of 29 C.F.R. § 2590.702(f)(4)(v), and (ii) the SPD fails to disclose the tobacco surcharge or describe the terms of the wellness program, in violation of the Final Regulations' requirement that wellness program terms be disclosed in the SPD when compliance affects premiums. These deficiencies disqualify Defendant from invoking the safe harbor for health-contingent wellness programs. Because Defendant cannot satisfy the criteria that "must be satisfied" for a compliant program, the tobacco surcharge is discriminatory under ERISA.

39.     Plaintiffs Schmidt and Guthrie were each charged the $50 monthly tobacco surcharge during their employment with Sevita. Each Plaintiff received the Plan's materials during enrollment but none of those materials informed Plaintiffs that ERISA entitled them to have their personal physicians' recommendations accommodated in developing a reasonable alternative standard, and none disclosed that any pathway to avoid or recover the surcharge existed other than completing the company's designated cessation program.

19

40.     Had Defendant complied with 29 C.F.R. § 2590.702(f)(4)(v) and disclosed in its Plan materials that a personal physician's recommendations would be accommodated, Plaintiffs would have been informed of, and could have considered, a meaningfully different pathway to qualify for the full reward. Among other things, Plaintiffs could have consulted with their personal physicians regarding individualized cessation strategies, such as physician-directed therapy, gradual nicotine reduction protocols, behavioral interventions tailored to medical history, or alternative timelines suited to underlying health conditions, and could have presented those physician-directed plans to Defendant as the basis for an alternative standard rather than enrolling. Plaintiffs could also have considered different medical plan elections during open enrollment had they been informed that the wellness program offered another meaningful avenue to avoid the surcharge.

41.     Sevita should have told participants of *all* the avenues they could take to avoid the surcharge, but it opted not to. That Sevita failed to include this information was not harmless. But for Defendant's notice failure, they could have invoked an ERISA-compliant alternative standard tailored to their personal physicians' recommendations. Defendant's omission deprived Plaintiffs of the ability to make informed elections during enrollment and the ability to invoke a physician-directed alternative standard during the Plan year, and resulted in Plaintiffs paying surcharges they would not otherwise have paid in the same amount or for the same duration.

42.     Because Defendant cannot satisfy the regulatory criteria for health-contingent wellness programs, its tobacco surcharge is discriminatory under ERISA. The complete absence of the physician accommodation statement from all Plan

20

materials, combined with the SPD's failure to disclose the surcharge or describe the wellness program, deprived participants of the information necessary to exercise their rights under the Plan.

## III.   DEFENDANT'S SELF-DEALING AND MISMANAGEMENT OF PLAN FUNDS

43.    Defendant Sevita administered the tobacco surcharge by designating which participants would be charged and withholding $50 per month directly from participants' paychecks as a required cost of medical coverage under the Plan. Although Sevita elected to withhold the surcharge on an after-tax basis, the surcharge functioned as a participant contribution to the Plan because it was a recurring monthly amount charged for, and required to maintain, coverage under the Plan. Indeed, Sevita's own enrollment materials confirm that the surcharge "will be added to your contribution cost for medical coverage." Ex. B. at 12. The tax treatment of the withholding does not alter the surcharge's character or function under ERISA; it affects only how the withholding is treated for purposes of the participant's taxable wages under IRC § 125.

44.    Under 29 C.F.R. § 2510.3-102, the assets of an ERISA plan include "amounts that a participant has withheld from his wages by an employer, for contribution . . . to the plan, as of the earliest date on which such contributions . . . can reasonably be segregated from the employer's general assets." The regulation turns on the function of the withholding, not on its tax treatment. The surcharge here was withheld from wages by Sevita as a condition of Plan coverage and was used to defray the Plan's costs and Sevita's own funding obligations under the Plan's governing documents. It accordingly became a

21

Plan asset on the earliest date it could reasonably have been segregated from Sevita's general assets, regardless of whether Sevita elected to withhold the amount on a pre-tax or after-tax basis.

45. The Plan's SPD provides that the Plan is "self-insured, meaning that Benefits are paid from the general assets of the Plan Sponsor and are not guaranteed under a Benefit policy or contract," and that "[t]he Plan Sponsor determines the amount of employee contributions to the Surest Plan, based on estimates of Claims and administrative costs." Ex. A. at 64. The SPD's glossary defines "Plan Sponsor" as the entity "responsible for providing funds for the payment of Benefits." *Id.* at 81. The Plan is thus funded through a combination of (i) employer payments from Sevita's general assets and (ii) required participant contributions, including the tobacco surcharge. Once participant amounts are withheld for contribution to the Plan, they must be administered "solely in the interest" of participants and beneficiaries. 29 U.S.C. § 1104(a)(1).

46. On information and belief, Sevita applied the tobacco-surcharge revenue to its own benefit by offsetting, dollar-for-dollar, the contributions Sevita was otherwise obligated to make to fund the Plan. Because the SPD obligates Sevita to fund Benefits "from the general assets of the Plan Sponsor," (*id.* at 64), and because Sevita itself "determines the amount of employee contributions . . . based on estimates of Claims and administrative costs," *id.*, every surcharge dollar Sevita collected reduced what Sevita was required to contribute from its own corporate accounts. The economic effect is the same whether the surcharge is withheld pre-tax or after-tax because the surcharge proceeds shift a portion of Sevita's funding obligation from Sevita's own assets onto the participants from

whom it is collected. The Plan, in turn, receives less employer funding than the SPD's funding commitment requires.

47.     This conduct constitutes self-dealing in violation of ERISA §§ 404(a)(1)(A) and 406(b)(1), 29 U.S.C. §§ 1104(a)(1)(A), 1106(b)(1). To the extent the surcharge withholdings are Plan assets within the meaning of 29 C.F.R. § 2510.3-102, Sevita dealt with Plan assets in its own interest and for its own account by applying the proceeds to reduce its funding obligations. And independent of plan-asset status, Sevita's deliberate structuring of the surcharge program (I.E., setting the surcharge amount, withholding the proceeds, retaining float and interest on those proceeds, and using them to reduce its own required contributions) was a discretionary fiduciary act undertaken for Sevita's own account, not "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1)(A). The duty of undivided loyalty is not contingent on plan-asset status; it governs every discretionary act a fiduciary takes in administering the Plan.

48.     Sevita's conduct also departs from the affirmative funding duty set out in the Plan's governing documents. The SPD provides that the Plan is self-insured and that "Benefits are paid from the general assets of the Plan Sponsor." Ex. A. at 64. The SPD further provides that the "Plan Sponsor determines the amount of employee contributions to the Surest Plan, based on estimates of Claims and administrative costs." *Id.* By collecting the unlawful surcharge from Plaintiffs' and other participants' wages and applying those amounts to reduce the contributions Sevita would otherwise owe under the Plan, Sevita used participant contributions to satisfy, in part, a funding obligation the Plan's documents

23

impose on Sevita as Plan Sponsor. That conduct is self-dealing in violation of ERISA §§ 404(a)(1)(A) and 406(b)(1).

49.    Even apart from any plan-asset analysis, Sevita separately breached its fiduciary duties through its administration of the tobacco-surcharge program and its communications about it. The program fails to include the required physician accommodation statement in any participant-facing material, including the SPD, enrollment and benefit guides, and specially designed tobacco surcharge FAQ documents. By disseminating an SPD that omits the description of the surcharge, the description of the wellness program, and the physician accommodation statement; by maintaining and communicating enrollment and benefit guides, Tobacco Surcharge FAQs, and cessation program flyers that suffer from the same omissions; and by failing year after year to monitor and correct the structural defects in the Plan's wellness program and in the Plan's participant-facing communications, Sevita acted disloyally and imprudently. These breaches flow from Sevita's fiduciary obligations under 29 U.S.C. § 1104(a)(1)(A)–(D) governing communications, prudent monitoring, and adherence to Plan documents, and they are actionable whether or not the surcharge proceeds themselves are characterized as Plan assets at any moment in time.

50.    By collecting surcharge amounts from participants and applying them to reduce its own funding obligation rather than transmitting them to the Plan, Sevita retained in its own corporate accounts dollars that, under the Plan's funding structure, should have either boosted the Plan's resources or reduced participants' cost of coverage. During the time those funds were held in Sevita's accounts, they generated float and interest for

Sevita's own benefit rather than the Plan's, further confirming that Sevita acted in its own interest and not "solely in the interest" of participants as ERISA § 404(a)(1) requires.

51. Independently, Sevita breached its fiduciary duties by administering a surcharge program that omitted, in all Plan-related, participant-facing materials, the required disclosures that a participant's personal physician's recommendations would be accommodated. The enrollment and benefit guides and FAQs, which are the materials participants actually rely on, describe a cessation program and the availability of a refund but provide no mechanism to request a physician-based accommodation, and omit any statement that personal physician recommendations will be honored. The SPD provides only a bare cross-reference to a wrap document. These non-compliant program terms and omissions were implemented through Plan administration and communications, misled participants about their ERISA rights, and further demonstrate Sevita's failure to act in accordance with Plan documents and applicable law.

52. In short, Sevita treated participant-paid tobacco surcharges as an employer offset rather than as Plan contributions. Under the Plan's self-insured structure, every surcharge dollar collected reduced the employer's required contributions to the Plan. The Plan was thereby deprived of the employer funding it otherwise would have received, while Sevita captured the financial benefit of those participant contributions through reduced cash outlays, increased liquidity, and float. These Plan-wide losses and corresponding employer gains are cognizable under ERISA § 502(a)(2) and establish violations of ERISA §§ 404 and 406. Any profits Sevita obtained through its retention and use of these funds, including float, interest, and the reduction of Sevita's own funding obligations, are

25

profits made through the use of Plan assets, which under 29 U.S.C. § 1109(a) must be restored to the Plan.

## CLASS DEFINITION AND ALLEGATIONS

53.     Plaintiff brings this action individually and on behalf of all other similarly situated individuals, pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure.

54.     Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> **Nicotine Surcharge Class** (the "**Class**")
> All individuals residing in the U.S. who, from 2014 to the time of judgment, paid a tobacco surcharge in connection with their participation in a health or welfare plan offered by Sevita.

55.     Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers and directors, and judicial officers and their immediate family members and associated court staff assigned to this case.

56.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

57.     The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3).

58.     **Numerosity**. This action is appropriately suited for a class action. The members of the Class are so numerous that the joinder of all members is impracticable. Plaintiff is informed, believes, and thereon alleges, that the proposed Class contains hundreds of participants who have been damaged by Defendant's conduct as alleged

herein, the identity of whom is within the knowledge of Defendant and can be easily determined through Defendant's records.

59.    **Commonality**. This action involves questions of law and fact common to the Class. The common legal and factual questions include, but are not limited to, the following:

   a. Whether Defendant's tobacco surcharge discriminates against participants based on a health status related factor;

   b. Whether the smoking cessation program offered by Defendant to participants constitutes a reasonable alternative standard as required under ERISA;

   c. Whether Defendant provided the required contact information and a statement that participants' personal physicians' recommendations would be accommodated in all Plan materials describing the tobacco surcharge;

   d. Whether Defendant's wellness program for tobacco users violated ERISA and the applicable regulations;

   e. Whether Defendant breached its fiduciary duties by collecting and retaining the tobacco surcharges;

   f. Whether Defendant breached its fiduciary duties by failing to periodically review the terms of its wellness programs to ensure compliance with ERISA and applicable regulations; and

   g. The appropriate mechanisms to determine damages on a class-wide basis for the Class.

60.    **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class, because, *inter alia*, all Class members have been injured through the uniform misconduct described above and were charged an improper and unlawful tobacco surcharge. Moreover, Plaintiff's claims are typical of the Class members' claims because Plaintiff is advancing the same claims and legal theories on behalf of herself and all

members of the Class. In addition, Plaintiff is entitled to relief under the same causes of action and upon the same facts as the other members of the proposed Class.

61.   **Adequacy of Representation**. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff and members of the Class each participated in health and welfare plans offered by Defendant and were harmed by Defendant's misconduct in that they were assessed an unfair and discriminatory nicotine surcharge. Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained competent counsel experienced in complex litigation and class action litigation. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff.

62.   **Superiority**. A class action is superior to other methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would be virtually impossible for a member of the Class, on an individual basis, to obtain effective redress for the wrongs done to him or her. Further, even if the Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single

proceeding, economies of scale, and comprehensive supervision by a single court, and presents no management difficulties under the circumstances here.

63.     Plaintiff seeks injunctive, declaratory, and equitable relief on grounds generally applicable to the Class. Unless the Class is certified, Defendant will be allowed to profit from its unfair and discriminatory practices, while Plaintiff and the members of the Class will have suffered damages. Unless Class-wide injunctions are issued, Defendant may continue to benefit from the violations alleged, and the members of the Class will continue to be unfairly treated.

## CAUSES OF ACTION
### COUNT I
### UNLAWFUL SURCHARGE – FAILURE TO PROVIDE NOTICE OF A REASONABLE ALTERNATIVE STANDARD
### (Violation of ERISA § 702, 29 U.S.C. § 1182(b) and PHSA § 2705, 42 U.S.C. § 300gg-4(j)(3)(E); 29 C.F.R. § 2590.702(f)(4)(v))

64.     Plaintiff re-alleges and incorporates herein by reference the prior allegations in this Complaint.

65.     Defendant unlawfully imposes a tobacco surcharge on all participants who use tobacco in violation of ERISA § 702. By imposing a discriminatory surcharge of $50 monthly on participants who use tobacco, without complying with the regulatory requirements, Defendant is violating ERISA § 702(b), 29 U.S.C. § 1182(b)(1). Defendant's tobacco surcharge program is not, and was not, a permissible wellness program because Defendant failed to provide proper notice in all Plan materials describing the wellness program, in violation of 42 U.S.C. § 300gg-4(j)(3)(E) and 29 C.F.R. § 2590.702(f)(4)(v).

29

66.     ERISA explicitly prohibits group health plans from requiring "any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor." *See* 29 U.S.C. § 1182(b). Defendant's Plan violates this prohibition because it fails to include in any Plan materials the physician accommodation statement required by 29 C.F.R. § 2590.702(f)(4)(v), and fails to include any description of the surcharge or wellness program in the SPD, in violation of 42 U.S.C. § 300gg-4(j)(3)(D)-(E) and 45 C.F.R. § 146.121(f)(4)(iv)-(v).

67.     While certain Enrollment Guides and FAQ documents describe a cessation program and indicate that participants may receive a refund upon completion, no Plan materials contain the required statement that a participant's personal physician's recommendations will be accommodated in developing a reasonable alternative standard, as mandated by 29 C.F.R. § 2590.702(f)(4)(v). Indeed, the 2025 Tobacco Surcharge FAQ—a three-page, nine-question document specifically devoted to the surcharge— makes no mention of the physician accommodation statement. *See* Ex. C. Each year, Sevita disseminated enrollment guides that described the tobacco surcharge (i.e., its price, the existence of the cessation program, and the possibility of a refund) but omitted the required statement that participants' personal physicians' recommendations will be accommodated. *See* Ex. B. Additionally, the SPD, the primary participant-facing disclosure document, does not describe the tobacco surcharge or the wellness program, providing only a bare cross-reference to a separate wrap document. These deficiencies mean that the wellness program,

30

as disclosed to participants, does not satisfy the regulatory criteria for a compliant program, and the surcharge is therefore discriminatory.

68.   By law, a wellness program must satisfy *all* of the regulatory criteria to qualify for the statutory safe harbor. Defendant's failure to include the physician accommodation statement in any Plan materials, and its failure to disclose the tobacco surcharge or the wellness program in the SPD, renders the tobacco surcharge program noncompliant and discriminatory. Because the required disclosures are absent from all Plan communications, Defendant's program cannot qualify for the statutory safe harbor, and the surcharge is unlawful.

69.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan." 29 U.S.C. § 1182(b) is a provision of ERISA that Plaintiff and members of the Class may enforce pursuant to 29 U.S.C. § 1132(a)(3). Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff seeks all available and appropriate remedies to redress violations of ERISA's anti-discrimination provisions outlined in § 1182(b), including but not limited to the relief set forth below in the Prayer for Relief.

## COUNT II
### BREACH OF FIDUCIARY DUTY AND PROHIBITED TRANSACTIONS
### (PLAN-LEVEL RELIEF)
### (Violation of ERISA §§ 404, 406 and 409, 29 U.S.C. §§ 1104, 1106 and 1109)
### (Brought Under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2))

70.    Plaintiff re-alleges and incorporates herein by reference the prior allegations in this Complaint.

71.    At all relevant times, Sevita was the Plan Administrator within the meaning of 29 U.S.C. § 1002(16) and a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A). The Plan's SPD confirms that Sevita, as Plan Sponsor, is "self-insured" and that "Benefits are paid from the general assets of the Plan Sponsor," and that the "Plan Sponsor determines the amount of employee contributions to the Surest Plan, based on estimates of Claims and administrative costs." Ex. A. at 64. The SPD provides that the Plan Administrator "has the authority and discretion to interpret the Plan's terms and Benefits available under the Plan and to make factual and legal decisions about them," and that its "powers and duties of the general administration of this Plan" include "[d]evelop[ing] policies, practices, and procedures for this Plan" and "[a]dminister[ing] the Plan in accordance with those policies, practices, and procedures." *Id.* at 72. The SPD's glossary defines "Plan Administrator" as the entity "that has the exclusive, final, and binding discretionary authority to administer the Surest Plan, to make factual determinations, [and] to construe and interpret the terms of the SPD." *Id.* at 81. The SPD further acknowledges that "[t]he Plan Administrator will exercise its discretion and fulfill its responsibilities in accordance with the provisions of ERISA." *Id.* at 72. These provisions are admissions, in Sevita's own Plan documents, that Sevita exercised the discretionary authority that triggers

32

fiduciary status under 29 U.S.C. § 1002(21)(A) and that its communications and disclosures are governed by ERISA's fiduciary standards.

72.     The same Plan documents confirm Sevita's funding obligations to the Plan. The SPD provides that the Plan is "self-insured, meaning that Benefits are paid from the general assets of the Plan Sponsor and are not guaranteed under a Benefit policy or contract," and that "[t]he Plan Sponsor determines the amount of employee contributions to the Surest Plan, based on estimates of Claims and administrative costs." Ex. A. at 64. The SPD's glossary defines "Plan Sponsor" as the entity "responsible for providing funds for the payment of Benefits." *Id.* at 81. These provisions establish, by the Plan's own terms, that Sevita bore primary responsibility for funding Plan benefits from its general corporate assets. Any diversion of participant contributions to offset that obligation necessarily reduced the funding the Plan would otherwise have received from Sevita.

73.     ERISA requires a fiduciary to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in the fiduciary's own interest. 29 U.S.C. §§ 1104(a)(1); 1106(b)(1). These duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

74.     ERISA imposes a specific fiduciary obligation to communicate wellness program terms in the SPD. The Final Regulations expressly state that "[f]or ERISA plans, wellness program terms (including the availability of any reasonable alternative standard)

33

are generally required to be disclosed in the summary plan description (SPD), as well as in the applicable governing plan documents . . . if compliance with the wellness program affects premiums . . . under the terms of the plan." Final Regulations, 33166. The SPD is the principal vehicle through which a Plan Administrator communicates Plan terms to participants, and the drafting, approval, and dissemination of the SPD is a quintessential fiduciary act.

75.    Sevita's SPD violates this obligation. The SPD does not describe the $50 monthly tobacco surcharge anywhere. It does not describe the cessation program. It does not provide instructions on how to access a reasonable alternative standard. It does not provide contact information for inquiries about the surcharge. And, critically, it does not include the statement that a participant's personal physician's recommendations will be accommodated. Instead, it contains a single directive to consult a separate document that, on information and belief, was not provided to participants.

76.    Sevita's SPD also represents that the Plan "will not establish rules for eligibility based on health status, medical condition, Claims experience, receipt of health care, [or] medical history," and that "[i]t is intended that the Plan will conform to the requirements of any applicable federal, state, or local law." Ex. A. at 72–73. Sevita's tobacco surcharge program contradicts both representations: it differentiates premium contributions based on a health-status factor and fails to satisfy the wellness program safe harbor that would permit such differentiation. By administering a Plan whose communications make these representations while simultaneously imposing and collecting

34

a surcharge that violates them, Sevita administered the Plan inconsistently with the Plan's own governing terms in violation of 29 U.S.C. § 1104(a)(1)(D).

77. Sevita's drafting, approval, and dissemination—year after year—of an SPD that omitted the disclosures ERISA requires, and that contained representations the surcharge program contradicted, were independent fiduciary acts and independent fiduciary breaches under 29 U.S.C. § 1104(a)(1)(A)–(D). These breaches misled participants about their rights, deprived them of information ERISA mandated be in the SPD, and impaired their ability to invoke a compliant reasonable alternative standard. They are exactly the kind of disclosure breach that 29 U.S.C. § 1104(a)(1) is designed to redress.

78. Instead of loyally and prudently acting in the best interests of Plan participants, Defendant chose, upon information and belief, to use participant contributions to exclusively benefit itself, to the detriment of the Plan and its participants, by unlawfully withholding tobacco surcharges from participants' paychecks and using those funds to offset the contributions it was obligated to make to fund the Plan. The SPD confirms that the Plan is self-insured and that "Benefits are paid from the general assets of the Plan Sponsor" and that the "Plan Sponsor determines the amount of employee contributions to the Surest Plan, based on estimates of Claims and administrative costs." *Id.* at 64. Upon information and belief, the tobacco surcharge was withheld from participants' wages on an after-tax basis, but regardless of the tax treatment of the withholding, the surcharge functioned as a participant contribution required to maintain coverage under the Plan and became a Plan asset under 29 C.F.R. § 2510.3-102 on the earliest date it could be segregated from Sevita's general assets. Defendant breached its fiduciary duty by assessing and

35

collecting the surcharge in violation of federal law and the Plan's own terms and then applying those amounts to reduce, dollar-for-dollar, Sevita's own funding obligations. Upon information and belief, Sevita further profited by retaining the surcharge amounts in its own corporate accounts, earning float and interest, before those amounts were used to reduce Sevita's funding obligation. The resulting harm is a Plan-level harm. The Plan received less employer funding than the SPD's funding commitment required, because participant contributions were used to satisfy a share of Sevita's responsibility to fund Plan benefits.

79. Year after year, Defendant acted as administrator of the Plan within the meaning of 29 U.S.C. § 1002(16) and as a fiduciary within the meaning of 29 U.S.C. § 1002(21), exercising discretionary authority over the management and administration of the Plan, including over the Plan's tobacco-surcharge and wellness-program features. Defendant exercised that discretion in deciding how surcharge proceeds would be handled once withheld from participants' wages, directing those proceeds to reduce its own funding obligations rather than augmenting Plan resources.

80. Upon information and belief, Defendant controlled and disseminated to all employees the SPD, the annual enrollment and benefit guides, the Tobacco Surcharge FAQs, and other Plan communications discussing the premium differential but failed to provide compliant notice as required by 42 U.S.C. § 300gg-4(j)(3)(E) and 29 C.F.R. § 2590.702(f)(4)(v). Sevita further failed to conduct periodic or prudent reviews of its surcharge program, its wellness program, the SPD, and the related participant communications to ensure compliance with ERISA and its implementing regulations.

36

Instead, Sevita administered a structurally defective wellness program, and disseminated a defective SPD and other participant-facing materials, year after year.

81.     Sevita breached its fiduciary duties of loyalty and prudence by administering a Plan that did not conform to ERISA's antidiscrimination requirements, by communicating an SPD that omitted required wellness-program disclosures including the physician accommodation statement, by using unlawfully withheld surcharge amounts to reduce its own funding obligations, and by failing year after year to review and correct the terms of the Plan, the SPD, and the disclosures made to participants. These breaches are incompatible with ERISA's core fiduciary mandates. These breaches caused direct financial harm to the Plan by depriving it of funding to which, under the SPD's express terms, it was entitled from Sevita's own assets.

82.     As a result of the unlawful surcharges, Sevita enriched itself at the expense of the Plan and its participants. By deducting these amounts directly from participants' paychecks under a wellness program that failed to satisfy § 300gg-4's notice requirement, and by promulgating an SPD that failed to disclose the surcharge or describe a reasonable alternative standard, Sevita secured financial savings for itself while participants bore increased costs. Defendant's deficient communications failed to notify participants of a reasonable alternative standard, as required, reducing the likelihood that participants would invoke a reasonable alternative standard and thereby maximizing the surcharge revenue available for Sevita to apply against its own funding obligations. In this way, Defendant transformed what ERISA contemplates as a bona fide wellness program into a mechanism for self-enrichment contrary to 29 U.S.C. § 1104(a)(1)(A).

37

83.     Further, by withholding unlawful tobacco surcharges from participants' paychecks and applying those funds to reduce its own funding obligations, obligations the SPD places on Sevita as Plan Sponsor, Defendant caused the Plan to engage in a transfer of Plan assets to, and use of Plan assets by or for the benefit of, a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(D). Sevita is a party in interest under 29 U.S.C. § 1002(14) as both the Plan Sponsor and a fiduciary exercising discretionary authority over Plan assets. By retaining and applying the surcharge amounts to offset its own funding obligations, Sevita dealt with Plan assets in its own interest and for its own account, in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1). The surcharge amounts should have been retained within the Plan's funding structure rather than displacing Sevita's required payments. Upon information and belief, Sevita benefitted from the float on those amounts at the expense of the Plan and its participants. Any profits Sevita obtained through its retention and use of these funds, including float, interest, and the reduction of Sevita's own funding obligations, are profits made through the use of Plan assets, which under 29 U.S.C. § 1109(a) must be restored to the Plan.

84.     The unlawful surcharge proceeds are traceable. Each surcharge was withheld as an identified, separately denominated payroll deduction—$50 per month per tobacco-using participant—reflected on participants' pay statements and recorded in Sevita's payroll and accounting systems on a per-participant basis. Once withheld, those amounts became Plan assets under 29 C.F.R. § 2510.3-102 and were either (i) retained in Sevita's corporate accounts before being applied to offset Sevita's funding obligations under the SPD, or (ii) routed directly into the Plan's funding stream and used to satisfy Sevita's

obligation to fund Benefits from its general assets. Either way, the amount, source, timing, and disposition of each surcharge dollar can be ascertained from Sevita's own books and records, and the proceeds remain identifiable as a discrete, segregable category of funds. This tracing supports both restitution of the surcharge amounts and disgorgement of the float, interest, and other benefits Sevita derived from holding those amounts, including the dollar-for-dollar reduction of Sevita's required contributions under the SPD's funding terms.

85.    The Plan suffered losses as a result of Defendant's conduct. The SPD provides that the Plan is self-insured and that "Benefits are paid from the general assets of the Plan Sponsor," a funding obligation Sevita partially satisfied with surcharge dollars withheld from Plaintiffs' and other participants' wages rather than with Sevita's own corporate assets. But for Defendant's use of the unlawful surcharge amounts to reduce its required payments, the Plan would have received both the surcharge amounts (as participant contributions) and the full measure of Sevita's required funding. Defendant's conduct thus deprived the Plan of resources to which, under its governing documents and applicable law, it was entitled. The measure of the Plan's loss is the full amount of the employer funding Sevita was required to contribute under the SPD's terms but instead offset with participant surcharge amounts, together with the profits Sevita realized through its retention of those amounts.

86.    By administering a tobacco-use surcharge that failed to satisfy ERISA's wellness program rules under ERISA § 702, 29 U.S.C. § 1182, and PHSA § 2705, 42 U.S.C. § 300gg-4, and the Final Regulations—and by communicating an SPD that failed

to satisfy ERISA's SPD-disclosure requirements for wellness program terms—Defendant violated both ERISA and the Plan's own terms requiring administration in compliance with ERISA.

87. Because the Plan collected and retained participant contributions imposed in violation of those provisions, Defendant breached its fiduciary duties under ERISA § 404(a)(1)(D) to administer the Plan in accordance with its governing documents and applicable law, and caused losses to the Plan within the meaning of § 409(a).

88. As a direct and proximate result of these fiduciary breaches, members of the Class lost millions of dollars in the form of unlawful surcharges that were deducted from their paychecks.

89. Plaintiffs are authorized to bring this action on a representative basis on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2). Defendant is liable to: make good to the Plan all losses resulting from its breaches, including but not limited to any and all equitable and remedial relief as is proper, disgorge all unjust enrichment and ill-gotten profits, and to restore to the Plan or a constructive trust all profits acquired through its violations, as alleged herein.

## COUNT III
### BREACH OF FIDUCIARY DUTY (INDIVIDUAL RELIEF)
**(Violation of ERISA §§ 404 and 406, 29 U.S.C. §§ 1104 and 1106)**

90. Plaintiff re-alleges and incorporates herein by reference the prior allegations in this Complaint.

91. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant to seek individualized equitable relief for a fiduciary's breach of duty. Sevita breached its fiduciary

duties by collecting unlawful tobacco surcharges from participants, treating those amounts as Plan assets, and using them to reduce its own contribution obligations rather than administering them solely for the benefit of participants and beneficiaries. That same conduct also constituted prohibited transactions under 29 U.S.C. § 1106(a)(1)(D) and § 1106(b)(1), because Sevita used Plan assets for its own benefit.

92.    At all relevant times, Sevita was the Plan Administrator within the meaning of 29 U.S.C. § 1002(16) and a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A), as the Plan's own SPD admits. *See* Ex. A. at 1 (identifying Sevita as the entity "ultimately responsible for administering the Surest Plan"); *id.* at 72 (Plan Administrator "has the authority and discretion to interpret the Plan's terms" and "will exercise its discretion and fulfill its responsibilities in accordance with the provisions of ERISA"); *id.* at 81 (Plan Administrator has "exclusive, final, and binding discretionary authority to administer the Surest Plan"). The SPD further provides that the Plan is "self-insured, meaning that Benefits are paid from the general assets of the Plan Sponsor," and that "[t]he Plan Sponsor determines the amount of employee contributions to the Surest Plan, based on estimates of Claims and administrative costs." *Id.* at 64. This funding commitment, together with ERISA's nondiscrimination and disclosure rules, gave each participant an individualized interest in being charged only amounts lawfully required of them and in receiving the disclosures ERISA mandates. Defendant's conduct infringed those individual interests directly, separately from any harm to the Plan as a whole.

93.    Plaintiffs suffered individualized harm from Sevita's conduct. They paid tobacco surcharges that should not have been imposed. They were also deprived of the

benefit of having those contributions deposited, retained, and used by the Plan to fund benefits and accumulate reserves solely in participants' interests. Because the Plan's funding structure ties participant contributions to the Plan's assets, reserves, and expected benefit obligations, Plaintiffs also bore higher contribution costs and increased risk of future cost increases or benefit reductions.

94.     Plaintiffs and the Class therefore seek individualized equitable relief under 29 U.S.C. § 1132(a)(3). That relief includes equitable restitution of unlawfully collected surcharge amounts traceable through Sevita's handling and commingling of Plan funds; disgorgement of profits and corporate savings Sevita obtained through its use of Plan assets; an accounting of all surcharge amounts collected and used to offset Sevita's contribution obligations; imposition of a constructive trust or equitable lien over funds wrongfully retained by Sevita; and declaratory and injunctive relief prohibiting Sevita from continuing to administer a noncompliant wellness program or using Plan assets to reduce its own contribution obligations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that judgment be entered against Defendant on all claims and requests that the Court award the following relief:

A. An Order certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as Class representatives for the Class, and appointing the undersigned to act as Class Counsel;

B. A declaratory judgment that the unlawful and discriminatory nicotine surcharge imposed on participants violates ERISA's anti-discrimination provisions set forth in ERISA § 702, 29 U.S.C. § 1182;

C. An Order instructing Defendant to reimburse all persons who paid the unlawful and discriminatory surcharges;

D. A declaratory judgment that Defendant breached its fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, following terms of the Plan that violated ERISA's anti-discrimination provisions and for failing to adequately monitor and review the terms of the wellness programs to ensure they complied with ERISA;

E. An Order requiring Defendant to provide an accounting of all prior payments of the surcharges under the Plan;

F. Declaratory and injunctive relief as necessary and appropriate, including enjoining Defendant from further violating the duties, responsibilities, and obligations imposed on it by ERISA with respect to the Plan and ordering Defendant remit all previously collected surcharges;

G. Disgorgement of any benefits or profits Defendant received or enjoyed due to the violations of ERISA § 702, 29 U.S.C. § 1182(b);

H. Restitution of all amounts Defendant charged for the surcharges;

I. Surcharge from Defendant totaling the amounts owed to participants and/or the amount of unjust enrichment obtained by Defendant as a result of its collection of the unlawful and discriminatory nicotine surcharge;

43

J. Relief to the Plan from Defendant for its violations of ERISA § 404, 29 U.S.C. § 1104, under 29 U.S.C. § 1109, including a declaration that the tobacco surcharge is unlawful; restoration of losses to the Plan and its participants caused by Defendant's fiduciary violations; disgorgement of any benefits and profits Defendant received or enjoyed from the use of the Plan's assets or violations of ERISA; surcharge; payment to the Plan of the amounts owed to members who paid the surcharge; removal and replacement of the Plan's fiduciaries, and all appropriate injunctive relief, such as an Order requiring Defendant to stop imposing the unlawful and discriminatory surcharge on participants in the future.

K. Imposition of a constructive trust or equitable lien over surcharge proceeds retained by Sevita or used to reduce Sevita's Plan funding obligations, and disgorgement of float and earnings thereon.

L. Plan-level restoration equal to employer funding displaced by participant-paid surcharges, plus lost earnings, and individual restitution equal to unlawfully collected surcharges not returned as part of the "full reward;"

M. An award of pre-judgment interest on any amounts awarded to Plaintiff and the Class pursuant to law;

N. An award of Plaintiffs' attorneys' fees, expenses, and/or taxable costs, as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

O. Any other relief the Court determines is just and proper.

Dated: May 14, 2026

Respectfully submitted,

*/s/ Philip J. Krzeski*
Philip J. Krzeski (MN 0403291)
**CHESTNUT CAMBRONNE PA**
100 Washington Ave S, Ste 1700
Minneapolis, MN 55401
Telephone: (612) 339-7300
*pkrzeski@chestnutcambronne.com*

Oren Faircloth*
William H. Payne*
**SIRI & GLIMSTAD LLP**
100 Pearl St, 14th Floor - #16946876
Hartford, CT 06103
Telephone: (212) 532-1091
*ofaircloth@sirillp.com*
*wpayne@sirillp.com*

**Pro hac vice* forthcoming

*Attorneys for Plaintiffs and the Proposed Class*